|  |  |
|---|---|
| **LUIS SANTOS CORDOVA, ET AL.,**<br><br>Plaintiffs<br><br>    v.<br><br>**MUNICIPALITY OF SAN JUAN,**<br><br>Defendant. | CIV. NO. 16-1348(PG) |

## AMENDED OPINION AND ORDER NUNC PRO TUNC

Before the court is defendants' motion for partial summary judgment (Docket No. 102), plaintiffs' oppositions (Dockets No. 119, 135, 150) and defendants' reply thereto (Docket No. 141). For the reasons set forth below, the court **GRANTS IN PART AND DENIES IN PART** the defendants' motion.

### I.  BACKGROUND

On February 29, 2016, Luis Santos Cordova, Ramon Agosto Sanchez, Luis Burgos Curcio, Anthony Ayala Nieves, Neftali Garcia Santiago, Jaime Rivera Garcia, Wilfredo Narvaez Cordero, Antonio Rosa Suarez, Cynthya Alvarez, Horacio Marcano, and Juan Valentin and their respective conjugal partnerships (collectively "Plaintiffs"), filed the above-captioned complaint against the Municipality of San Juan ("Defendant" or "the MSJ" or "the Municipality") and Guillermo Calixto in his official capacity.[1][2] In their amended complaint filed on June 22, 2016, the Plaintiffs alleged that at all relevant times, they were employed by the Defendant as municipal police officers of the department's canine unit. See Docket No. 44. According to the Plaintiffs, the MSJ violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, by failing to make required minimum wage and overtime payments to Plaintiffs. Specifically, the Plaintiffs allege that Defendant required, suffered, and permitted Plaintiffs to regularly work more than their scheduled time per workweek without proper compensation for time spent in connection with the care of their dogs, including feeding,

---

[1] Although the Plaintiffs initially filed claims against Guillermo Calixto in his personal capacity, they subsequently moved for dismissal of those claims against him. See Docket No. 31. The court entered partial judgment accordingly. See Docket No. 66.
[2] On October 20, 2016, the plaintiffs moved to voluntarily dismiss Horacio Marcano, Cynthia Alvarez, and Juan Valentin's claims. See Docket No. 96. The court granted their request and dismissed their overtime claims with prejudice. See Docket No. 100.

watering, grooming, bathing, exercising, cleaning up after, transporting, training, and bonding with their dogs. See Docket No. 44 at ¶¶ 26, 33. The Plaintiffs contend that the excess "consisted of up to 14 hours," id. at ¶ 26(b), "[f]rom July 13, 2014 to the filing of this lawsuit … with exception of Officers Rosa and Narvaez, who did so until December 2015 … ," id. at ¶ 34. The Plaintiffs additionally invoke the court's supplemental jurisdiction over analogous labor state law claims.

The Defendant answered the complaint and countersued the Plaintiffs pursuant to local law claiming that an internal audit resulting from the Plaintiffs' complaint revealed that "some or all of the Plaintiffs received payments in excess of their legal compensation as a result of works performed as employees of the MSJ." Docket 46 at ¶ 3. The Defendant now seeks to collect these amounts.

On November 17, 2016, the Defendant moved for partial summary judgment in its favor arguing that the canine handlers were already compensated for fourteen (14) hours of dog maintenance functions in their weekly shifts; that the canine handlers were responsible for accurately and opportunely completing their time sheets and seeking prior supervisor approval if they had to work overtime; that the Plaintiffs were indeed paid for overtime when reported; and, that Plaintiffs failed to apprise the MSJ that the compensation received was incorrect, thereby preventing the MSJ from finding out whether the time reported was accurate. See Docket No. 102. The Municipality also submits the overpayments it has made to Plaintiffs are subject to recovery pursuant to local law. Id. In their opposition, the Plaintiffs argue that they were prohibited from reporting the hours they spent caring for the canines while in their homes and for time worked receiving pre-shift instructions. It is Plaintiffs' position that genuine issues of material fact prevent summary disposition of their claims. See Docket No. 135.

## II.   STANDARD OF REVIEW

A motion for summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure, which entitles a party to judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When the party who bears the burden of proof at trial is faced with a properly constituted summary judgment motion, defeating the motion depends

on her ability to show that such a dispute exists." <u>Geshke v. Crocs, Inc.</u>, 740 F.3d 74, 77 (1st Cir.2014)(<u>citing</u> <u>Borges ex rel. S.M.B.W. v. Serrano-Isern</u>, 605 F.3d 1, 5 (1st Cir.2010)).

If the non-movant generates uncertainty as to the true state of any material fact, the movant's efforts should be deemed unavailing. <u>See</u> <u>Suarez v. Pueblo Int'l</u>, 229 F.3d 49, 53 (1st Cir.2000). Nonetheless, the mere existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48, 106 S.Ct. 2505 (1986). "Summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." <u>Medina-Muñoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir.1990).

At the summary judgment juncture, the court must examine the facts in the light most favorable to the non-movant, indulging that party with all possible inferences to be derived from the facts. <u>See</u> <u>Rochester Ford Sales, Inc. v. Ford Motor Co.</u>, 287 F.3d 32, 38 (1st Cir.2002). The court reviews the record "as a whole," and "may not make credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 135 (2000). This is so because credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. <u>Id.</u>

### III.  FINDINGS OF FACT

Before setting forth the facts found by this court to be undisputed and relevant to the matter at hand, we must first address several compliance issues presented to the court when reviewing Plaintiffs' opposing statement of facts.

In addition to Federal Rule of Civil Procedure 56, the local rules of civil procedure govern the parties' submissions of summary judgment materials. <u>See</u> L. Cv. R. 56 (D.P.R. 2009). Regarding the filing of opposing statements of material facts, Local Rule 56(c) states as follows:

> A party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts. The opposing statement shall admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts. Unless a fact

> is admitted, the opposing statement shall support
> each denial or qualification by a record citation as
> required by this rule. The opposing statement may
> contain in a separate section additional facts, set
> forth in separate numbered paragraphs and supported
> by a record citation as required by subsection (e)
> of this rule.

L.Cv.R. 56(c). "This separate section containing additional facts is necessary to allow the moving party to reply to those additional facts and to allow the court to easily determine the disputed facts. … Therefore, a party may not include numerous additional facts within its opposition to the moving party's statements of uncontested facts." Malave-Torres v. Cusido, 919 F.Supp.2d 198, 207 (D.P.R.2013) (internal citations omitted).

The First Circuit Court of Appeals has consistently upheld the enforcement of this anti-ferret rule, which "prevents parties from 'improperly shift[ing] the burden of organizing the evidence presented in a given case to the district court.'" Carreras v. Sajo, Garcia & Partners, 596 F.3d 25, 31 (1st Cir. 2010) (citing Mariani-Colon v. Dep't of Homeland Sec., 511 F.3d 216, 219 (1st Cir.2007)). The First Circuit has held "with a regularity bordering on the monotonous that parties ignore the strictures of an 'anti-ferret' rule at their peril." Puerto Rico American Ins. Co. v. Rivera-Vázquez, 603 F.3d 125, 131 (1st Cir.2010); see also Advanced Flexible Circuits, Inc. v. GE Sensing & Inspection Techs. GmbH, 781 F.3d 510, 521 (1st Cir.2015) (noting that failure to comply with the standards of Local Rule 56 by the nonmovant allows the district court to accept the moving party's facts as stated).

In their opposing statements of fact, the Plaintiffs deny or qualify the Defendant's numbered statements including additional facts of their own. Pursuant to the applicable local rule, Plaintiffs should have listed these additional facts separately in numbered paragraphs. But they were not. "The plain language of the [local] rule specifically requires that additional facts be put forward in a 'separate section.'" Carreras, 596 F.3d at 32. Given the failure of Plaintiffs' well-seasoned attorneys to abide by the applicable rules, the court is in its discretion to ignore these misplaced additional facts. Therefore, the court will "disregard any additional facts provided by [Plaintiffs] when denying or qualifying [Defendant's] statement of uncontested facts." Levine-Diaz v. Humana Health Care, 990 F. Supp. 2d 133, 140 (D.P.R. 2014) (citing Acevedo-Parrilla v.

Novartis Ex-Lax, Inc., 696 F.3d 128, 137 (1st Cir.2012)). The court will
also disregard a belated Supplemental Statement (Docket No. 150) the
Plaintiffs filed on March 8, 2017 - over a month after the Defendant's
Reply (Docket No. 141) was filed - that merely contains generic and
irrelevant statements.

        In addition, the court notes that the Plaintiffs support their denials
or qualifications with unsworn statements under penalty of perjury signed
by some of the Plaintiffs on January 16, 2017, see Docket No. 136-7; that
is, two months after the motion for partial summary judgment was filed. In
essence, these statements set forth the type of work these officers perform
at the canine unit. They also claim to work approximately 6.25-7.0
uncompensated hours per week. The Defendant complains in its reply memo
that the Plaintiffs merely attempt to controvert clear answers to
deposition questions with these seven affidavits that are identical,
generic and self-serving. See Docket No. 141. In addition, the Defendant
points out that the unsworn statements were all drafted by counsel and
state that "[t]his statement has been drafted in English based on my
statements to counsel in the Spanish language." See id. at page 9.

        "It is settled that '[w]hen an interested witness has given clear
answers to unambiguous questions, he cannot create a conflict and resist
summary judgment with an affidavit that is clearly contradictory, but does
not give a satisfactory explanation of why the testimony is changed.'"
Torres v. E.I. Dupont De Nemours & Co., 219 F.3d 13, 20 (1st Cir.2000)
(citing Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st
Cir.1994)). Nonetheless, "[e]ven a clearly self-serving affidavit
constitutes evidence which the court must consider when resolving summary
judgment motions." Malave-Torres v. Cusido, 919 F.Supp.2d 198, 204
(D.P.R.2013) (citing Cadle Co. v. Hayes, 116 F.3d 957, 961 n. 5 (1st
Cir.1997) ("A party's own affidavit, containing relevant information of
which he has first-hand knowledge, may be self-serving, but it is
nonetheless competent to support or defeat summary judgment.")). In
determining whether an affidavit is admissible, the analysis of whether
the affidavit should be stricken from a party's opposition to a motion for
summary judgment does not simply end with a determination that the
affidavit is self-serving inasmuch as the court must determine whether it
is a sham. See id.

     The court finds that it is definitely suspect that the officers'
affidavits were drafted by their attorneys for their signature in a
language they do not speak, as well as concocted after counsel had
conveniently had a chance to review the MSJ's arguments in favor of summary
dismissal. In these affidavits, the Plaintiffs all claim to not have
reported the overtime "because [their] supervisor does not permit [them]
to do so." See Docket No. 136-7. Yet, the identity of this supervisor is
still unknown to the court despite these supervisors being parties to this
claim as plaintiffs. These unsworn statements definitely appear to have
been tailor-made to surmount the Defendant's motion, and are thus deemed
a sham. See Perez v. Volvo Car Corp., 247 F.3d 303, 316 (1st Cir. 2001)
("Affidavits purporting to describe meetings or conversations need not
spell out every detail, but to receive weight at the summary judgment stage
they must meet certain rudiments. Statements predicated upon undefined
discussions with unnamed persons at unspecified times are simply too
amorphous to satisfy the requirements of Rule 56(e), even when proffered
in affidavit form by one who claims to have been a participant.") (citing
Jefferson Constr. Co. v. United States, 283 F.2d 265, 267 (1st Cir.1960);
Alger v. United States, 252 F.2d 519, 521 (5th Cir.1958); 11 JAMES WM. MOORE
ET AL., MOORE'S FEDERAL PRACTICE ¶ 56.14[1][d] (3d ed. 1997) ("The affidavit,
in addition to presenting admissible evidence, must be sufficiently
specific to support the affiant's position.")).

     Therefore, in its review of the testimony given in Plaintiffs'
depositions versus their statements under penalty of perjury, the court
disregarded the contents of the latter when it was either incongruent with
the deposition testimony or the matter in question was the subject of
extensive questioning during depositions, yet the officers decided to
elaborate further in their affidavits. The court also ignored the content
of the unsworn statements to the extent they were used to support additional
facts purported by the Plaintiffs in the same numbered paragraphs wherein
they admitted, denied or qualified the Defendant's proposed factual
statements. As stated above, the non-movant cannot incorporate its own
version of events in the paragraphs where it opposes a moving party's
statements of fact.

    The court will deem as admitted the following properly supported assertions of fact contained in Defendant's statement of uncontested material facts:

1.    The work shifts for MSJ Police officers consists of 8-hour days and no more than 40 hours a week.

2.    Pursuant to the MSJ's Security Code, under no circumstances are MSJ police officers allowed to work in excess of the shift (8 hours a day, 40 hours a week) without the consent and express approval of the immediate supervisor, who shall justify the reason or need thereto.

3.    Time worked that exceeds a regular shift (i.e., either 8 hours a day or 40 hours a week), shall result in compensatory time at a rate of time and a half.

4.    "Municipal Compensatory Time" consists of hours worked in excess of a work shift (whether daily or weekly), and accumulated at time-and-a-half (1.5), if the employee does not exceed 40 hours a week.

5.    Municipal Compensatory Time can only be enjoyed, and is not subject to payment.

6.    For MSJ police officers, "Federal Compensatory Time" is time worked in excess of 40 hours a week which is accumulated at time-and-a-half (1.5); the accumulated excess over 480 hours of Federal Compensatory Time is subject to payment at the salary the employee is receiving at the time of payment.

7.    Pursuant to an employee manual regarding work schedules, the employee is required to register, with exactitude, the time he or she begins and ends work, and any worked extra hours must be approved by the immediate supervisor; otherwise, such extra hours will not be computed [for compensation purposes].

8.    Pursuant to the same manual, at the end of the week, an employee that has worked extra time must hand in the weekly attendance sheet to the supervisor for review and signature.

9.    Pursuant to the same manual, an employee must register the extra time worked immediately after finishing his or her daily shift, and it is the employee's responsibility to obtain the supervisor's direct authorization before working extra time; if the supervisor

does not sign the extra time registered, such extra time will not be considered for compensation.

10. Pursuant to the same manual, if an employee disagrees with his or her balance of licenses, he or she must make a written claim to the Personnel Officer in his or her department.

11. In 2014, a group of the MSJ Canine Unit submitted a claim for uncompensated time to the Federal Department of Labor.

12. In 2014, Luis Burgos Curcio complained to his supervisors, co-plaintiffs Antonio Rosa and Ramon Agosto, that he was not receiving enough compensation, and "[w]e called the Federal Department of Labor in order to give us some sort of orientation."

13. Luis Burgos Curcio was interviewed by the U.S. Department of Labor regarding his functions with the dog and to explain how he went about his workday.

14. The Wage and Hour Division of the U.S. Department of Labor required the MSJ to provide all time records and compensation between May of 2013 to July of 2014 related to all officers of the Canine Unit.

15. As a result, the MSJ and the U.S. Department of Labor executed an agreement to compensate for the extra time that the handlers of the dogs of the Canine Unit of the MSJ Police worked performing duties in the unit and outside the unit.

16. As part of such agreement with the U.S. Department of Labor, the MSJ agreed to compensate the canine handlers for backpay (and interests) accrued from May 1, 2013 to July 13, 2014, and also:

> agreed to comply fully with all the provisions of the FLSA in the future. In regards to the Canine Unit (K-9) officers, you have agreed to: 1) comply by ensuring to record all hours worked, including time spent in canine care and patrol car wash. 2) You have also agreed to rearrange the employee's work schedule as follows: 6 hours regular shift, plus 2 hours canine care (one hour spent at home) for a total of 8 hours per day. 3) You have also agreed to pay 2 hours per day in the K-9 officer's days off (4 hours on weekends). 4) All hours in excess of 40 per week will be accrued at time and one-half. 5) K-9 officers will wash the official vehicle during their regular scheduled hours at the employer's establishment.

17. The members of the Canine Unit were compensated for one year of dog maintenance time and the MSJ adopted internal 2014-09 directive.

18. Directive 2014-09 is an agreement with the federal government "about some actions that we needed to take, based on the evaluation that they did, about a situation in the K-9 Unit, about the time, the working hours, the accumulated hours."

19. Directive 2014-09 establishes the terms of the working hours of the Canine Unit "that was established with the … Federal Department of Labor."

20. Directive 2014-09 provides that, for canine handlers who have a dog assigned, their daily eight-hour shifts shall consist of:
a. six (6) hours to perform regular duties only when the officer has a canine assigned;
b. one hour immediately after taking service to perform duties related to maintenance of the canine and related equipment; and,
c. one hour after finishing the 6-hour period to perform duties related to maintenance of the canine and related equipment even outside of the Canine Unit.

21. Directive 2014-09 also provides for two hours of extra time worked for care of the assigned canine during non-work days.

22. Directive 2014-09 also mandates that canine handlers record their time according to their revised daily shifts (i.e., six hours of regular duties between one hour before and after for dog maintenance), as well as the two hours of dog maintenance for non-work days — and that any excess of 40 hours per week will be computed as extra time.

23. Directive 2014-09 also mandates that accumulated time in excess of 40 hours a week be registered, on the attendance sheets, as extra time worked.

24. Directive 2014-09 became effective on July 15, 2014.

25. The "Registration and Weekly Assistance" is where Canine Unit officers "write in all of the hours that we work during the week," which employees themselves fill out its contents and sign it.

26. Such attendance sheet is filled out by the employee, including time of entrance and exit, as well as "Extra time worked," and is

then signed by "the sergeant of the unit."

27.  Effective July 1st, 2015, the MSJ established a procedure for employees to initiate claims regarding time worked and compensatory time (June 26, 2015 "Procedure for Notification and resolution of Claims Regarding Compensatory Licenses"). It requires an employee to fill out a claim form and file it in the personnel office of his or her department, and the Director of the Office of Management of Human Resources and Labor Relations will issue a final determination to the employee, which will apprise the employee of his right to appeal before the Public Service Appellate Commission.

## Antonio Rosa Suarez

28.  Antonio J. Rosa Suarez started working in the Canine Unit of the MSJ Police in 2002, and was expelled on December, 2015.

29.  While he was a police officer of the MSJ Canine Unit, Antonio Rosa Suarez helped create the regulations and processes of such unit.

30.  Around 2012, Antonio Rosa Suarez was promoted to sergeant of the Canine Unit.

31.  According to Antonio Rosa Suarez, an employee needs authorization from the immediate supervisor to obtain compensation for extra time worked outside of eight hours.

32.  According Antonio Rosa Suarez, a supervisor has to certify all hours worked by a supervised employee, both regular time and extra time.

33.  Between 2002 and 2015, Antonio Rosa Suarez authorized extra time worked by employees of the Canine Unit of the MSJ Police.

34.  According to Antonio Rosa Suarez, he authorized extra time by a supervised officer that he knew, as supervisor, that such employee had worked such hours.

35.  As supervisor, if Antonio Rosa Suarez knew that a supervised employee had worked extra hours, he authorized such hours.

36.  As supervisor, Antonio Rosa Suarez was "never" the object of an employee complaint for failing to authorize extra time of work performed by an employee.

37.  Antonio Rosa Suarez supervised the other seven co-plaintiffs, and

he never denied any of them their claimed extra hours for work performed.

38. From June 30, 2014 up to the time he stopped working at the Canine Unit of the MSJ Police, Antonio Rosa Suarez did not handle any dog from the Canine Unit.

Ramon Agosto Sanchez

39. Ramon Agosto Sanchez started to work in the Canine Unit of the MSJ Police in 2010, and has worked there from that year to the present.

40. In 2012, Ramon Agosto Sanchez was promoted to sergeant.

41. Part of Ramon Agosto Sanchez's duties as Sergeant of the Canine Unit were supervising the unit's officers and assign the areas where they had to go and patrol.

42. Regarding the time worked by the supervised Canine Unit's officers, Ramon Agosto Sanchez had to keep track of the hours they were working and certify their attendance sheets.

43. Ramon Agosto Sanchez has never denied a supervised employee's claim of extra time.

44. Co-plaintiff Antonio Rosa was Ramon Agosto Sanchez's supervisor.

45. Ramon Agosto Sanchez has been the interim director of the Canine Unit since the middle of 2015 to the present, after co-plaintiff Antonio Rosa was dismissed from the Unit.

46. During his time as interim director of the Canine Unit, Ramon Agosto Sanchez has supervised the time sheets of the unit's officers, validating the extra time claimed by them, and has been responsible for any discrepancy between the time worked by an employee and the time authorized.

47. Ramon Agosto Sanchez was paid by the MSJ for the extra time worked between June 30, 2014 to January 3, 2016. See Docket No. 102-1 at ¶¶ 47-52.

48. Ramon Agosto Sanchez's attendance sheets, for the period between January 4, 2016 to July 31, 2016, faithfully reflect the regular hours and extra hours worked by him, and he was compensated for the extra time therein. See Docket No. 102-1 at ¶¶ 53-54.

49. Ramon Agosto Sanchez has not heard any MSJ officer say that the Canine Unit will not be compensated for work actually performed.

50. Ramon Agosto Sanchez does not have any knowledge of any rule or directive, that applies to the Canine Unit of the MSJ, that prohibits payment for work actually performed, nor heard of any officer being denied compensation for work performed.

CANINE HANDLER PLAINTIFFS

Luis Santos Cordova

51. Luis Santos Cordova started working in the Canine Unit of the MSJ Police in 2010.

52. Luis Santos Cordova has never informed a supervisor that he was not being compensated enough.

53. Luis Santos Cordova was compensated for the extra time reported in his assistance sheets between July 14, 2014 to December 29, 2014. See Docket No. 102-1 at ¶¶ 60-61.

54. Luis Santos Cordova was compensated for the extra time reported in his assistance sheets between January 5, 2015 up to the week of March 30, 2015; between April 6, 2015 to April 3, 2016; between April 10, 2016 and July 25, 2016. See Docket No. 102-1 at ¶¶ 62-67.

Luis Burgos Curcio

55. Luis Burgos Curcio started to work in the Canine Unit of the MSJ in 2010.

56. For the period between June 30, 2014 to October 5, 2014, Luis Burgos Curcio avers that the MSJ compensated him for that time period, but not completely, because the extra time worked during vacation time was accumulated to municipal hours, and that's federal hours.

57. Regarding the time sheets between October 6, 2014 to January 4, 2015, Luis Burgos Curcio did not inform the MSJ of hours that are not contained on those time sheets, and he avers that the MSJ accumulated his extra hours during vacation at the municipal rate instead of the federal rate.

58. Luis Burgos Curcio was completely compensated by the MSJ for the hours reported in the time sheets between April 6, 2015 to July 5, 2015.[3]

59. Regarding the time sheets between January 4, 2016 to June 30, 2016, Luis Burgos Curcio was completely compensated by the MSJ for the hours reported. See Docket No. 102-1 at ¶¶ 75-76.

60. Since Directive 2014-09 came into effect, Luis Burgos Curcio has not asked his supervisors to add time working with the dog at home in excess of the reported hours.

Neftali Garcia Santiago

61. Aside from the instant case, Neftali Garcia Santiago has not made any claim for uncompensated time taking care of the canine that falls outside the periods provided in Directive 2014-09.

62. Regarding the time sheets between June 30, 2014 and the week of September 22, 2014, Neftali Garcia Santiago was completely compensated by the MSJ for the hours reported.

63. For the trimester between October and December of 2014, Neftali Garcia Santiago is not sure if he was compensated for the time that appears in his time sheets for that period.

64. For the periods onward, Neftali Garcia Santiago knows that he gets paid if he has accumulated more than 480 hours, but he does not know if the MSJ is paying for that overtime.

Wilfredo Narvaez Cordero

65. During his time in the Canine Unit (2008-2015), Wilfredo Narvaez Cordero was supervised by co-plaintiff Antonio Rosa.

66. Antonio Rosa was in charge of reviewing the time worked by Wilfredo Narvaez Cordero; Wilfredo Narvaez Cordero does not know if Antonio Rosa took away time the former had actually worked.

67. The other persons that supervised Wilfredo Narvaez Cordero at the Canine Unit were lieutenant Pacheco, captain Gomez, inspector Heriberto Pagan, and captain Haddock; none of them ever reduced

---

[3] Defendant's Statements of Fact 72 and 74 regarding Burgos' compensation for hours reported in additional time sheets were not properly supported by the record citations to his deposition. See Docket No. 102-1, ¶¶ 72, 74.

the time Wilfredo Narvaez had worked for purposes of diminishing his compensation.

68. Wilfredo Narvaez Cordero has no reason to believe that the MSJ made a plan to deprive officers of the K-9 Unit of payment for time actually worked, nor if either co-plaintiffs Antonio Rosa or Ramon Agosto had done so—either by themselves or under orders by the MSJ.

69. Wilfredo Narvaez Cordero has no knowledge of any of his supervisors receiving an instruction to reduce the time actually worked for purposes of diminishing his compensation.

70. Wilfredo Narvaez Cordero's common practice was to note, in his time sheets, the time he had worked beyond his regular eight-hour shifts — and that time beyond eight hours was never denied by a supervisor.

71. Wilfredo Narvaez never claimed time beyond the two hours for off-day canine maintenance provided in Directive 2014-09.

Jaime Rivera Garcia

72. Jaime Rivera Garcia's time sheets for the period between June 30, 2014 to September 28, 2014 contain all the hours he reported as worked to the MSJ, including extra time.

73. For the period between June 30, 2014 to September 28, 2014, Jaime Rivera Garcia was compensated for the hours reported to the MSJ, but could not tell if the MSJ paid everything.

74. Jaime Rivera Garcia's time sheets for the period between September 29, 2014 and December 28, 2014 contain all the hours he reported as worked to the MSJ.

75. For the period September 29, 2014 and December 28, 2014, Jaime Rivera Garcia was compensated for the hours reported to the MSJ, but couldn't tell if the MSJ paid everything.

76. Jaime Rivera Garcia's time sheets for the period between December 29, 2014 to March 29, 2015 contain all the hours he reported as worked to the MSJ — except for the week of January 6-18, 2015.

77. For the period between December 29, 2014 to March 29, 2015, Jaime Rivera Garcia was compensated for the hours reported to the MSJ, but couldn't tell if the MSJ paid everything.

78. Jaime Rivera received a copy of Directive 2014-09, and was told by co-plaintiffs Antonio Rosa and Ramon Agosto to follow it.

79. Jaime Rivera claims that his time sheets did not feature all hours he worked.

80. After receiving Directive 2014-09, Jaime Rivera made no claim about not being compensated enough for maintenance of the canine and the patrol car.

## IV.  DISCUSSION

### A. Fair Labor Standards Act ("FLSA")

The federal statute in question here is the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*, which was "enacted in 1938 to 'protect all covered workers from substandard wages and oppressive working hours.'" Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2121 (2016) (citing Barrentine v. Arkansas-Best Freight System, Inc., 450 U.S. 728, 739 (1981)). "Among its other provisions, the FLSA requires employers to pay overtime compensation to covered employees who work more than 40 hours in a given week. The rate of overtime pay must be 'not less than one and one-half times the regular rate' of the employee's pay." Encino Motorcars, 136 S. Ct. at 2121 (citing 29 U.S.C. § 207(a)). "The basic elements of a FLSA claim are that (1) plaintiffs must be employed by the defendants; (2) the work involved interstate activity; and, most importantly for present purposes, (3) plaintiffs 'performed work for which they were under-compensated.'" Manning v. Boston Med. Ctr. Corp., 725 F.3d 34, 43 (1st Cir. 2013) (citing Pruell v. Caritas Christi, 678 F.3d 10, 12 (1st Cir.2012)).

The Plaintiffs here are municipal police officers of the canine unit of the Municipality of San Juan seeking recovery under FLSA (and local laws) for overtime work performed in connection with the care of their assigned canine units. See *Amended Complaint*, Docket No. 44. In its motion for summary judgment, the MSJ first seeks dismissal of the claims filed by co-plaintiff Rosa Suarez, who did not perform any dog maintenance duties at any and all relevant times herein. Rosa Suarez was the supervisor of his co-plaintiffs in this case until his dismissal in December of 2015. Between June of 2014 and the date of his termination, he admittedly did not handle a canine unit. See Statement of Uncontested Fact (SUF) No. 38. Neither has he set forth a claim for uncompensated overtime hours for work

unrelated to the care of a Canine Unit's dog. Therefore, the Municipality's request is **GRANTED** and Rosa Suarez's claims are hereby **DISMISSED**.

The Defendant seeks the dismissal of the FLSA claims of six (6) other plaintiffs on grounds that they failed to notify their supervisors, accurately fill out their attendance timesheets and/or avail themselves of the existing administrative procedures that were in place to make such claims for compensation. Therefore, the Defendant argues that it is not liable to the Plaintiffs because it lacked the requisite knowledge. The Plaintiffs oppose these assertions.

The FLSA defines the term "employ" as "to suffer or permit to work." 29 U.S.C. § 203(g). Under this definition, "an employer's actual or imputed knowledge is a necessary condition to finding the employer suffers or permits that work. … Actual knowledge is not required; constructive knowledge will suffice." Manning, 725 F.3d at 44 (citations and quotation marks omitted). "It is the employee's burden to show, by a preponderance of the evidence, that his employer had actual or constructive knowledge that he worked overtime." Andrews v. Weatherproofing Techs., Inc., No. CV 15-11873-TSH, 2017 WL 4317386, at *7 (D. Mass. Sept. 28, 2017) (citing Pforr v. Food Lion, Inc., 851 F.2d 106 (4th Cir. 1988); Porcal v. Ciuffo, No. 10-cv-40016-TSH, 2013 WL 3989668 (D.Mass. Aug. 1, 2013)).

Now, where the work at issue is purportedly performed by the employees off-site, including at home, away from the immediate gaze of their superiors, plaintiffs will likely need to rely on constructive knowledge for some, if not all, of the hours at issue. See Rueli, 835 F.3d at 63 (citing Manning, 725 F.3d at 44 (finding the allegation that an employer had actual or constructive knowledge under the FLSA of nurses' unpaid hours sufficient to survive a motion to dismiss, where "the employees' uncompensated work was performed on defendants' premises during operational hours, and in full view of defendants' managers and supervisors"). "The constructive knowledge inquiry is not limited to facts — it is intertwined with an analysis of the employer's duty to inquire into what workers are doing, and what reasonable diligence the employer must perform to ensure that unauthorized hours are not being worked." Rueli v. Baystate Health, Inc., 835 F.3d 53, 63 (1st Cir. 2016). "But, reasonable diligence is not an expectation of omniscience." Craig v. Bridges Bros. Trucking LLC, 823 F.3d 382, 389 (6th Cir. 2016). "[W]here an employer has no knowledge that

an employee is engaging in overtime work and that employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of § 207(a)." Crowe v. Examworks, Inc., 136 F. Supp. 3d 16, 43 (D. Mass. 2015) (citations omitted).

"To ensure compliance with its provisions, the FLSA requires that an employer keep and preserve records of its employees' wages and hours in addition to records concerning its employment practices." Andrews, 2017 WL 4317386 at *7 (citing 29 U.S.C. § 211(c); 29 C.F.R. § 516.2). "'[T]he employee bears some responsibility for the proper implementation of the FLSA's overtime provisions,' and an employer is allowed to put in place reasonable time-reporting procedures to help it keep track of its employees' hours." Craig, 823 F.3d at 389 (citing White v. Baptist Mem'l Health Care Corp., 699 F.3d 869, 876 (6th Cir.2012)). In fact, establishing a reasonable time-keeping process for an employee to report uncompensated work time is one way an employer can exercise the requisite diligence for purposes of establishing knowledge or lack thereof. See Allen v. City of Chicago, 865 F.3d 936, 938 (7th Cir. 2017). Moreover, "[a] rule or policy against unauthorized overtime or requiring prior approval for any work that would result in overtime can prevent an employer's liability for overtime if it is enforced." Crowe, 136 F. Supp. 3d at 43 (citing 29 C.F.R. § 785.13; Chao v. Gotham Registry, Inc., 514 F.3d 280, 288-89 (2d Cir.2008)).

In terms of determining liability, our sister court has recently held that "[w]here an employer establishes a reasonable process for an employee to report uncompensated work time, the employer is not liable for non-payment if the employee fails to follow the established process." Andrews, 2017 WL 4317386 at *7 (citing Craig, 823 F.3d at 389). "In such circumstances the relevant standard transforms from 'I know that the employee was working' into 'I know the employee was working and not reporting his time.'" Id. "But an employer's formal policy or process for reporting overtime will not protect the employer if the employer prevents or discourages accurate reporting in practice." Allen, 865 F.3d at 939 (citing White, 699 F.3d at 876). Therefore, "once an employer knows or has reason to know that an employee is working overtime, it cannot deny

compensation even where the employee fails to claim overtime hours." Holzapfel v. Town of Newburgh, N.Y., 145 F.3d 516, 524 (2d Cir. 1998).

The Municipality argues that it paid for the overtime the Plaintiffs reported in their timesheets and that it lacked knowledge of the additional overtime hours they now claim to have worked. On the other hand, the Plaintiffs respond that the canine officers were prohibited from reporting their overtime. But the only evidence that is properly on record to that effect are deposition statements by two of the canine officers regarding the inaccuracies of the timesheets and the Defendant's alleged knowledge. Plaintiff Narvaez asserted that the timesheets only contain the hours they are "allowed" to write down, see Docket No. 120-3 at page 107, and that some unnamed supervisor knew they spent hours in excess of the ones agreed upon caring for the dogs because he saw the canine officers perform the work at the police station before their shift began, id. at pages 105-106. Also, plaintiff Rivera Garcia stated during his deposition that after reading Directive 2014-09, "we" told the supervisors that the hours allocated for canine care were not enough, but they were told that they "had to follow the directive." See Docket No. 120-2 at page 72. Accordingly, he maintains that his timesheets did not feature all of the hours he worked. See SUF No. 79.

"In an action for unpaid overtime wages in violation of the FLSA, the burden of proof generally is upon the plaintiff-employee to establish by a preponderance of the evidence the number of hours of overtime worked each week and the amount of wages due each pay period." Brubach v. City of Albuquerque, 893 F. Supp. 2d 1216, 1224 (D.N.M. 2012) (citing Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 686–87 (1946)). Other than the aforementioned deposition testimonies and the Plaintiffs' generic and vague unsworn statements - which this court rejected for the reasons discussed supra -, the record here is devoid of such evidence. "A necessary part of plaintiffs' burden of proof [is] to show [their employer] 'suffered' or allowed them to work off—the-clock hours." Andrews, 2017 WL 4317386, at *7 (D. Mass. Sept. 28, 2017) (citing Pforr, 851 F.2d at 109). "[S]uch proof may be made by proof of a pattern or practice of employer acquiescence in such work, but plaintiffs may not merely estimate off-the-clock hours worked without presenting a showing that [their employer] 'suffered' that work." Id. The court thus finds that Narvaez and Rivera Garcia's unspecific

assertions are insufficient to meet their required burden of proof to recover two years of overtime hours (2014-2016) on behalf of all Plaintiffs. See Pforr, 851 F.2d at 109 ("It is not enough for a plaintiff to establish his employer's knowledge of a few incidents of off-the-clock work, and upon this claim of knowledge, submit a record of his three years of alleged off-the-clock work.").

In addition, the court finds that the Municipality had a reasonable time-keeping process in place for the Plaintiffs to record the hours they worked. The Plaintiffs' posture that they were prohibited from reporting overtime hours is contradicted by the fact that they actually logged overtime on various occasions and were never denied compensation for it. In fact, the supervising co-plaintiffs, namely, Rosa Suarez and Agosto Sanchez, declared that they authorized and never denied the overtime hours the canine officers requested during the relevant time period. See SUF No. 35, 37, 43, 46. "The record indicates that plaintiffs who followed such procedures were paid. … [T]he fact that some employees chose not to follow those procedures is not sufficient to establish that [defendant] had constructive knowledge of uncompensated work or a general, common policy of failing to compensate for all work performed." Norceide v. Cambridge Health All., No. CIVA 10-11729-NMG, 2014 WL 775453, at *3 (D. Mass. Feb. 24, 2014) (citing White, 699 F.3d at 876 (affirming summary judgment for employer: "When the employee fails to follow reasonable time reporting procedures she prevents the employer from knowing its obligation to compensate the employee.")). Given that evidence on record regarding the existing timekeeping practices, we cannot say that it was unreasonable for the Defendant to rely on the logs to ensure that the Plaintiffs were paid for their overtime hours, especially where it is undisputed that Plaintiffs' job, by its very nature, involved the performance of duties where they could not be monitored easily by their supervisors.

"Nor is there evidence that the County was on notice that hours were being regularly under-reported or that it should have been monitoring hours more closely." Hertz v. Woodbury Cty., Iowa, 566 F.3d 775, 782 (8th Cir. 2009). As a matter of fact, officers Santos Cordova, Burgos Curcio, Garcia Santiago, Narvaez Cordero and Rivera Garcia all testified that they did not log or claim hours devoted to the care of the dogs beyond those set forth in the Directive. See SUF 52, 60-61, 72, 81. As a result, they can

be said to have prevented Defendant from learning of their overtime work and from obtaining the requisite knowledge for purposes of liability under the FLSA. See Crowe, 136 F. Supp. 3d at 43. As in White, the Plaintiffs' claims fail because the employer had established a reasonable process to report overtime hours, and there is no evidence that the employer actually had any kind of knowledge that the canine officers were not being compensated for time worked. See Jones-Turner v. Yellow Enteprise Sys., LLC, 597 F. App'x 293, 298 (6th Cir. 2015) (employer was not required under FLSA to cross-check crew logs with missed-meal slips to ensure that emergency medical technicians were paid for all missed meals, where employees did use reasonable missed-meal slip procedure and were reimbursed for their missed meals and employer did not have any constructive or actual knowledge that its employees were not receiving their meal breaks and were not being compensated for that time).

Likewise, "[t]here is no indication here that the officers were discouraged from submitting overtime slips or that submitted slips went unpaid." Hertz, 566 F.3d at 782 (citing Brennan v. Gen. Motors Acceptance Corp., 482 F.2d 825, 827 (5th Cir.1973)). Supervisor Agosto Sanchez and Narvaez both testified that they were unaware of any rule or instruction prohibiting payment for actual work or overtime. See SUF No. 49-50, 68-69. There is also no evidence suggesting that the Municipality required the Plaintiffs to submit falsified time records that underreported their hours. The fact that the officers were perhaps told by their supervisor(s) that they had to follow Directive 2014-09 does not amount to having been prevented or discouraged from accurately recording the hours they worked. Their subjective interpretation of such an order is not conclusive of having been forced to submit incorrect timesheets. On the contrary, the Directive itself and the employee manual establish clear procedures for registering the time actually worked and provides for the payment of overtime when officers record having worked in excess of forty (40) hours per week. See SUF No. 20-23. In addition to these directives and regulations, in 2015, the Municipality established a procedure whereby employees could notify and initiate internal claims regarding compensatory licenses. See SUF No. 27. None of the plaintiffs here availed themselves of the same. Therefore, we find that "[r]easonable diligence did not … require the employer to investigate further." Allen, 865 F.3d at 942.

In conclusion, the Plaintiffs' assertions that caring for their assigned dogs took more hours than the ones agreed upon in the Directive are unsubstantiated. They presented no admissible evidence of the amount or the extent of hours they worked without compensation. And through no fault of their employer, they admit to ignoring the procedures for reporting such overtime. Moreover, they were unable to marshal proof that the Municipality knew or should have known of their overtime work. "To hold that [plaintiff] is entitled to deliberately evade [defendant-employer's] policy would improperly deny [defendant-employer's] right to require an employee to adhere to its procedures for claiming overtime." Fairchild v. All Am. Check Cashing, Inc., 815 F.3d 959, 965 (5th Cir. 2016). Plaintiffs here failed to raise a genuine issue of material fact as to whether they went uncompensated for overtime work that the Municipality knew of. Therefore, they cannot prevail and partial summary judgment must be **GRANTED**.

On a final note, pursuant to the agreement the Defendant reached with the U.S. Department of Labor in 2014 - not long before this complaint was filed - the Plaintiffs were already being compensated for fourteen hours a week of dog maintenance duties, including four hours during off-duty days. In accordance with the unsworn statements the Plaintiffs attached to their Opposing Statement of Material Facts (Docket No. 136-7), the canine officers claimed to work 6-7 hours per week in excess of the agreed-upon hours, for a purported total of over 20 compensable weekly hours of dog handling duties exclusively.

The court realizes that determining the amount of canine care-time the officers actually spent may prove quite difficult. See Brock v. City of Cincinnati, 236 F.3d 793, 803 (6th Cir. 2001) ("Examining the minutiae of how long it takes to feed a dog or clean up after it is difficult enough, but determining whether a dog got a treat or a pet or a scratch primarily for the benefit of the [defendant] borders on (and may exceed) the limits of the absurd."); see also Rudolph v. Metro. Airports Comm'n, 103 F.3d 677, 684 (8th Cir. 1996) ("There is no evidence that a reasonable employer would necessarily have known that half an hour per off-duty day was too short a time to perform the tasks [defendant] told the officers to perform. Any time beyond the half-hour plaintiffs spent with their canine charges we presume stemmed from their personal devotion to the dogs, and

was, therefore, not 'predominantly for the benefit of the employer'… .").
But "[o]ver-zealous employees could cause unintended bankruptcies within
police departments, and ultimately force municipalities to eliminate K-9
units — despite their valuable contributions to law enforcement — because
of cost." Holzapfel, 145 F.3d at 527.

"Because of the difficulty in determining the exact hours worked in
circumstances where unsupervised employees can divide their time between
'work' and personal pursuits, 'any reasonable agreement of the parties
which takes into account all of the pertinent facts will be accepted.'"
Brock, 236 F.3d at 805 (citing 29 C.F.R. § 785.23). 29 C.F.R. § 785.23
allows the use of a "reasonable agreement" to determine the number of
compensable hours due to an employee who works at home or who lives on the
employer's premises.[4] Courts have "regard[ed] the § 785.23 reasonable
agreement provision as doubly appropriate in canine handler cases." Brock,
236 F.3d at 805. Agreements reached pursuant to 29 C.F.R. § 785.23 are "a
useful tool by which police departments and their K-9 officers could avoid
the very problems at issue here." Holzapfel, 145 F.3d at 527. "[S]ound
policy considerations … counsel in favor of agreements between the
parties." Brock, 236 F.3d at 805. "K-9 officers will know precisely the
extent of their responsibilities. Municipalities and their police
departments can budget with relative accuracy, and minimize concern that
they will be required to defend against an overtime claim involving
thousands of dollars." Holzapfel, 145 F.3d at 527.

In the case at hand, the Plaintiffs claim to have worked caring for
the dogs for more than the hours spelled out in the Directive. But "this

---

[4] The regulation reads as follows:

> Employees residing on employer's premises or working at home.

> An employee who resides on his employer's premises on a permanent
> basis or for extended periods of time is not considered as
> working all the time he is on the premises. Ordinarily, he may
> engage in normal private pursuits and thus have enough time for
> eating, sleeping, entertaining, and other periods of complete
> freedom from all duties when he may leave the premises for
> purposes of his own. It is, of course, difficult to determine
> the exact hours worked under these circumstances and **any
> reasonable agreement of the parties which takes into
> consideration all of the pertinent facts will be accepted.** This
> rule would apply, for example, to the pumper of a stripper well
> who resides on the premises of his employer and also to a
> telephone operator who has the switchboard in her own home.

29 C.F.R. § 785.23 (emphasis ours).

extra work is not sufficient to establish an FLSA overtime claim." Cabrera
v. Town of Lady Lake, Florida, No. 5:10-CV-415-OC-34PRL, 2013 WL 12092573,
at *11 (M.D. Fla. Mar. 28, 2013), *aff'd sub nom.* Cabrera v. Town of Lady
Lake, Fla., 556 F. App'x 801 (11th Cir. 2014) (citing Rudolph, 103 F.3d at
684 ("It is not enough for plaintiffs to show that they worked more than
agreed.")). Instead, "[t]hey must show that the agreement provided an
unreasonably short amount of time to perform the assigned tasks. … This
they have failed to do." Rudolph, 103 F.3d at 684 (internal citations
omitted). Worse, they did not even attempt to do so. As a result, the court
was never in a position to determine the reasonableness of the compensation
agreement set forth in Directive 2014-09. The Plaintiffs' opposition, thus,
fell short on this front as well.

### B. Supplemental State Law Claims

The seven co-plaintiffs against which the Municipality sought summary
judgment also filed claims grounded on Puerto Rico law. Defendants have
requested the dismissal of these claims. See Docket No. 102 at pages 13-
14. Since their federal claims have been dismissed and no other grounds
for jurisdiction exist, the court declines to exercise supplemental
jurisdiction over these plaintiffs' remaining state-law claims. See
Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 349 (1988) (explaining that
the exercise of pendent jurisdiction is a matter of the federal court's
discretion and not one of plaintiff's rights); United Mine Workers v.
Gibbs, 383 U.S. 715, 725 (1966) (stating "if the federal claims are
dismissed before trial, … the state law claims should be dismissed as
well."). Accordingly, these plaintiffs' claims brought pursuant to Puerto
Rico law are hereby **DISMISSED WITHOUT PREJUDICE.**

The Defendant also seeks summary judgment in its favor for its
counterclaims of overpayments against these officers. These counterclaims
are also grounded on Puerto Rico law. For the same reasons stated above,
the court will not exercise supplemental jurisdiction over these claims
and the Defendant's counterclaims against these plaintiffs are hereby
**DISMISSED WITHOUT PREJUDICE.**

### V.    CONCLUSION

For the reasons stated above, the Defendant's motion for partial
summary judgment (Docket No. 102) is hereby **GRANTED IN PART AND DENIED IN
PART**. The FLSA claims of plaintiffs Luis Santos Cordova, Ramon Agosto

Sanchez, Luis Burgos Curcio, Neftali Garcia Santiago, Jaime Rivera Garcia, Wilfredo Narvaez Cordero and Antonio Rosa Suarez are hereby **DISMISSED WITH PREJUDICE**; their supplemental state law claims, as well as the Municipality's counterclaim against them are hereby **DISMISSED WITHOUT PREJUDICE.** Pending before the court are Anthony Ayala Nieves' claims.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, December 12, 2017.

S/ JUAN M. PÉREZ-GIMÉNEZ
JUAN M. PÉREZ-GIMÉNEZ
SENIOR U.S. DISTRICT JUDGE